STATE of Wisconsin, Plaintiff-Respondent,

v.

Dennis C. STRONG, Defendant-Appellant.†

Court of Appeals

*No. 2010AP1798–CR. Submitted on briefs January 4, 2011. —Decided March 24, 2011.*

2011 WI App 43

(Also reported in 796 N.W.2d 438.)

---

† Petition for Review Filed.

554

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Steven D. Grunder*, assistant state public defender, Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general and *Thomas J. Balistreri*, assistant attorney general.

Before Hoover, P.J., Peterson and Brunner, JJ.

¶ 1. PETERSON, J. A jury found Dennis Strong guilty of attempted possession of an improvised explosive device, contrary to Wis. Stat. § 941.31(2)(b).[1] Strong argues the evidence at trial was insufficient to convict him because the devices he constructed did not contain either explosive material or a means of detonation. He also argues he could not be convicted of attempted possession because there was no evidence that he unequivocally formed the intent to possess an improvised explosive device. We reject Strong's arguments and affirm.

## BACKGROUND

¶ 2. At Strong's jury trial, lieutenant Terry Hammen, a bomb technician with the Outagamie County sheriff's department, testified that he was called to investigate two "improvised incendiary devices" police found on Strong's property. Each device consisted of a five-gallon pail filled with methyl ethyl ketone, a flammable liquid. Extension cords ran into each pail. One end of each extension cord was stripped, so that bare wires were in contact with the liquid. Each extension cord was attached to a switch, and the switches were plugged into wall outlets. The switches could be operated by remote controls that police retrieved from

[1] All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

Strong's property. The parties stipulated that there were no batteries in the remote controls.

¶ 3. Hammen explained that methyl ethyl ketone is more commonly known as acetone, which is a paint thinner.[2] He testified methyl ethyl ketone is highly flammable and can be ignited with an electrical current, provided there is enough resistance to generate sufficient heat. Hammen testified he was unable to detonate Strong's devices, as assembled, because there was not enough resistance between the extension cord wires. However, after he added a high-resistance element—a gum wrapper—between the wires, he was able to ignite a sample of the liquid, creating a "fire ball." Hammen testified that, had one of the devices at Strong's residence been detonated, it would have produced a large fire ball and "started a fire in the residence."

¶ 4. When asked about the difference between a fire ball and an explosive, Hammen responded, "It's usually the rate that it expands. Explosives would be a high order where this is . . . just more of a flash." He later testified the difference is "the rate of expansion, so an explosion is a high order. It's going to be—usually they measure by feet per second how fast a projectile will go. Flammable is much slower, a flammable." When asked whether a fireball or flash is distinct from an actual explosion, Hammen answered, "It's still defined as an explosion. It's just not a high order explosion. You

---

[2] The parties agree that methyl ethyl ketone and acetone are closely related but, chemically, are not the same substance. They also agree that both methyl ethyl ketone and acetone are highly flammable. For purposes of this appeal, the distinction between the two liquids is not relevant. Because photographs of the devices found on Strong's property show that the pails were labeled "methyl ethyl ketone," we will refer to the liquid as methyl ethyl ketone in the subsequent discussion.

560

could have low order depending on the feet per second how fast it explodes, how fast it expands." Hammen testified a fireball can be part of an explosion.

¶ 5. Officer Brian Bahr also testified at trial. Bahr testified that he responded to Strong's residence on the night police discovered the incendiary devices. When Bahr spoke to Strong about the devices, Strong indicated he never intended to detonate them. Strong told Bahr he constructed the devices to scare away individuals whom he felt had threatened him.

¶ 6. Christopher Rindt, a family friend who was at Strong's residence on the night in question, similarly testified that Strong never said anything about detonating the devices. Rindt testified it was his impression Strong built the devices "to scare somebody away."

## DISCUSSION

■

¶ 7. Strong argues there was insufficient evidence to convict him of attempted possession of an improvised explosive device for two reasons. First, he argues the devices he possessed were not improvised explosive devices because they did not contain either explosive material or a means of detonation.[3] This argument

---

[3] Strong was charged with *attempted* possession of an improvised explosive device, not actual possession. Thus, even if the devices Strong assembled were not technically improvised explosive devices, the jury could nevertheless convict him if it found that he: (1) intended to possess an improvised explosive device; and (2) did acts toward the commission of that crime which demonstrate unequivocally that he formed that intent and would have committed the crime except for the intervention of an extraneous factor. *See* WIS. STAT. § 939.32(3). However, the State does not argue that the jury could have convicted

requires us to interpret WIS. STAT. § 941.31(2), the statute under which Strong was charged. Statutory interpretation is a question of law that we decide without deference to the trial court. *State v. Mattes*, 175 Wis. 2d 572, 578, 499 N.W.2d 711 (Ct. App. 1993).

■

¶ 8.  Second, Strong contends there was insufficient evidence for the jury to find that he unequivocally formed the intent to possess an improvised explosive device, a required element of attempted possession. *See* WIS. STAT. § 939.32(3). We may not reverse a conviction based on insufficient evidence "unless the evidence, viewed most favorably to the state and the conviction, is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." *State v. Poellinger*, 153 Wis. 2d 493, 501, 451 N.W.2d 752 (1990).

## I. Improvised explosive device

¶ 9.  WISCONSIN STAT. § 941.31(2)(b) prohibits possession of "any improvised explosive device."[4] "Improvised explosive device" is defined as:

> [A] destructive explosive device capable of causing bodily harm, great bodily harm, death or property

---

Strong on this basis. Instead, it argues the evidence was sufficient to establish that Strong actually possessed improvised explosive devices.

[4] In addition to prohibiting possession of improvised explosive devices, WIS. STAT. § 941.31(2)(b) also prohibits possession of "materials or components with intent to assemble any improvised explosive device[.]" Strong was not charged under the "intent to assemble" portion of the statute.

damage; *with some type of explosive material and a means of detonating the explosive material,* directly, remotely, or with a timer either present or readily capable of being inserted or attached[.]

WIS. STAT. § 941.31(2)(a) (emphasis added). The statute requires that an improvised explosive device include both explosive material and a means of detonating that material. *See id.*; *see also* WIS JI—CRIMINAL 1351A (May 2008) (stating that, to convict, the jury must find "the device was an explosive; that is, that it contained some type of explosive material and a means of detonating that material" (footnote omitted)).

*A. Explosive material*

■

¶ 10. Strong argues the methyl ethyl ketone in his devices was not an "explosive material," as that term is used in WIS. STAT. § 941.31(2). Neither § 941.31(2) nor the pattern jury instruction defines "explosive material." If a statutory term is undefined, our next recourse is normally to use a recognized dictionary to determine the term's common and ordinary meaning. *State v. Polashek*, 2002 WI 74, ¶ 19, 253 Wis. 2d 527, 646 N.W.2d 330.

■■

¶ 11. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 802 (unabr. 1993), defines an "explosive" as an "explosive substance," that is, "a substance that on ignition by heat, impact, friction, or detonation undergoes very rapid decomposition (as combustion) with the production of heat and the formation of more stable products (as gases) which exert tremendous pressure as they expand at the high temperature produced[.]"

¶ 12.  Based on Hammen's testimony, methyl ethyl ketone meets this definition of an "explosive." Hammen testified methyl ethyl ketone burns up rapidly on ignition. Thus, when ignited, methyl ethyl ketone "undergoes very rapid decomposition (as combustion)." *See id.* Hammen stated methyl ethyl ketone produces a fireball when ignited, which satisfies the "production of heat" requirement. *See id.* He also testified that duct tape that was covering the openings on the buckets would have prevented gases from escaping Strong's devices. This suggests ignition of the methyl ethyl ketone would have produced "more stable products (as gases)." *See id.*

¶ 13.  Finally, Hammen testified about the expansion that occurs when methyl ethyl ketone is ignited. *See id.* He testified the difference between a fireball and an explosion is "the rate that it expands. Explosives would be a high order where this is . . . just more of a flash." When asked whether a fireball or flash is distinct from an actual explosion, Hammen testified, "[I]t's still defined as an explosion. It's just not a high order explosion. You could have low order depending on the feet per second how fast it explodes, how fast it expands." Hammen did not testify as to the precise rate of expansion that occurs when methyl ethyl ketone is ignited, but his testimony suggests that some degree of expansion does take place. Thus, using the dictionary definition of "explosive," the methyl ethyl ketone in Strong's devices qualifies as an explosive substance or material.

¶ 14.  Strong argues we should not use the dictionary definition of "explosive" because that definition includes materials that are merely flammable. He contends methyl ethyl ketone is one such material that is flammable, but not explosive. He notes that the Wis-

consin Statutes distinguish between flammable or combustible materials on the one hand, and explosive materials on the other. He cites WIS. STAT. § 943.05, which prohibits placement of "any *combustible* or *explosive* material or device in or near any property with intent *to set fire to* or *blow up* such property." (Emphasis added.) He argues that using the dictionary distinction of "explosive" would obviate this distinction.

¶ 15.    While WIS. STAT. § 943.05 distinguishes between combustible and explosive materials, we do not agree that the two terms are always mutually exclusive. By distinguishing between combustible and explosive materials in § 943.05, the legislature recognized that some materials are combustible but not explosive. Therefore, § 943.05 prohibits placement of both combustible and explosive materials in order to encompass those materials that are strictly combustible. However, this does not mean that a material cannot be both combustible and explosive. Thus, the distinction between combustible and explosive materials in § 943.05 does not preclude us from using a definition of "explosive" that includes some combustible materials.

¶ 16.    Strong also argues it is inappropriate to use the dictionary definition of "explosive" because we have previously used a definition from the Wisconsin Administrative Code to interpret the term "explosive compound." In *State v. Brulport*, 202 Wis. 2d 505, 513, 516, 551 N.W.2d 824 (Ct. App. 1996), we were asked to determine whether homemade bombs were "explosive compounds" for purposes of WIS. STAT. § 941.31(1). Brulport had combined aluminum foil and drain cleaner in two plastic soda bottles before sealing the bottles and placing them in a neighbor's mailbox and car. *Id.* at 511–12. Approximately ten minutes later,

both bottles exploded due to a chemical reaction between the foil and drain cleaner. *Id.* at 512.

¶ 17.   On appeal, Brulport argued the combination of drain cleaner and foil in a plastic bottle did not constitute an "explosive compound." Because that term was not defined in the charging statute, we looked to the administrative code for guidance. The code defined "explosive" as "any chemical compound, mixture or device, the primary or common purpose of which is to function by explosion." *Id.* at 515 (citation omitted). As for the meaning of "compound," we turned to the dictionary definition—"something . . . that is formed by a union of elements, ingredients, or parts." *Id.* at 516 n.4 (citation omitted). Applying these definitions, we concluded Brulport's homemade bombs were explosive compounds because they contained "compounds" whose primary purpose "was to create an explosion." *Id.* at 516.

¶ 18.   Strong argues *Brulport* requires us to use the administrative code definition of "explosive" to define the statutory term "explosive material." Using this definition, he contends methyl ethyl ketone is not an explosive material because its primary or common purpose is to thin paint. *See* Wis. Admin. Code § Comm 7.20(12) (Feb. 2008) (" 'Explosive' means any chemical compound, mixture or device, the primary or common purpose of which is to function by explosion[.]").

¶ 19.   However, in *Brulport* we were called upon to interpret the term "explosive compound" in Wis. Stat. § 941.31(1). Here, we are interpreting a different term, "explosive material," in a different statutory subsection, Wis. Stat. § 941.31(2)(a). It made sense to use the administrative code definition of "explosive" in *Brulport* because the issue there was whether a "compound," a mixture of different materials, was explosive. We deter-

566

mined the compound in Brulport's devices was explosive because it consisted of a mixture of components that had no other purpose but to cause an explosion. *Brulport*, 202 Wis. 2d at 516. Neither drain cleaner nor aluminum foil, individually, has the primary purpose to explode; however, there is no reason to combine those ingredients except to create an explosion.

¶ 20. In contrast, the issue in this case is whether a single ingredient in a device qualifies as an "explosive material." In this context, it does not make sense to use the administrative code's "primary or common purpose" definition of explosive because doing so would mean that many commonly recognized bomb components are not explosive materials. For instance, using this definition, nitrogen fertilizer would not qualify as an "explosive material" because its primary purpose is to fertilize crops. Similarly, the primary purpose of methyl ethyl ketone is to thin paint, not to cause explosions. However, as Hammen's testimony established, methyl ethyl ketone can be used to cause explosions when combined with other components. Thus, in the context of determining whether a single ingredient qualifies as an explosive material, it makes more sense to use the dictionary definition than to rely on the administrative code.

### B. *Means of detonation*

¶ 21. Strong next argues the devices he assembled were not improvised explosive devices because they did not contain a means of detonation. *See* WIS. STAT. § 941.31(2)(a). He contends that, as assembled, the devices would not have been capable of detonating because there was insufficient resistance between the exposed wires. He notes that Hammen had to add an

additional, high-resistance bridge between the wires to generate enough heat to ignite the methyl ethyl ketone. He also notes that there were no batteries in the remote controls when police recovered them.

¶ 22. However, WIS. STAT. § 941.31(2)(a) states that an improvised explosive device must contain "a means of detonating the explosive material, directly, remotely, or with a timer *either present or readily capable of being inserted or attached*[.]" (Emphasis added.) Thus, a device qualifies as an improvised explosive even if it lacks a functioning detonator, as long as a means of detonation can be readily inserted or attached. Strong's devices meet this requirement because Strong could have made the detonators operable with the insertion of two readily available parts. As the State points out, "It would have been no problem to insert batteries in the remote controller, and to attach a resistant conductor to the exposed ends of the electrical cord. The police did that simply by putting an aluminum foil chewing gum wrapper on the wires."

¶ 23. Strong contends the phrase "either present or readily capable of being inserted or attached" modifies "timer," not "means of detonating." We are unconvinced. We question why the statute would distinguish between direct and remote means of detonation on the one hand, and detonation by a timer on the other, requiring that the former actually be present but the latter only be readily capable of being attached. It makes little sense to distinguish between these methods of detonation. It is more reasonable to read the statute as requiring that any means of detonation—whether direct, remote, or by timer—be either present or readily capable of being added to the device.

568

## II. Attempted possession—Strong's intent

¶ 24. Strong also contends there was insufficient evidence to convict him of attempted possession of an improvised explosive device because there was no evidence that he unequivocally formed the intent to possess an improvised explosive device.[5] He argues the uncontroverted testimony of Bahr and Rindt establishes that he never intended to detonate the devices and only constructed them "to scare somebody away."

■■ ■■

¶ 25. However, the jury could conclude Strong intended to possess an improvised explosive device based on the evidence showing that he actually did possess improvised explosive devices. "[P]roof of a completed crime does not foreclose the possibility of conviction of the attempt to commit the crime[.]" *See Berry v. State*, 90 Wis. 2d 316, 328–29, 280 N.W.2d 204 (1979). To require acquittal of an attempt because the completed offense was proved would result in the "anomalous situation of a defendant going free 'not because he was innocent, but for the very strange reason, that he was too guilty.' " *Id.* at 328 (quoting *United States v. Fleming*, 215 A.2d 839, 840–41 (D.C. App. 1966)). Sufficient evidence supports Strong's conviction because, based on Hammen's testimony, the jury could

---

[5] WISCONSIN STAT. § 939.32(3) states:

An attempt to commit a crime requires that the actor have an intent to perform acts and attain a result which, if accomplished, would constitute such crime and that the actor does acts toward the commission of the crime which demonstrate unequivocally, under all the circumstances, that the actor formed that intent and would commit the crime except for the intervention of another person or some other extraneous factor.

have concluded beyond a reasonable doubt that Strong actually possessed improvised explosives. *See Poellinger*, 153 Wis. 2d at 501.

*By the Court.*—Judgment affirmed.